UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,                                    Plaintiff,

v.                                         Criminal Action No. 3:22-cr-88-DJH

PHIL PASCOE (1),
SCOTT TUBBS (2),
MONICA PASCOE (3), and
QUADRANT MAGNETICS, LLC (4),                              Defendants.

* * * * *

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendants Phil Pascoe, Scott Tubbs, Monica Pascoe, and Quadrant Magnetics, LLC moved to dismiss allegations that they violated export laws and regulations by sending magnet schematics to Chinese manufacturers, arguing that those regulations are unconstitutionally vague as applied to their conduct.  (Docket No. 88)  Defendants also moved to suppress evidence related to the alleged export violations on the ground that the warrant affidavits were insufficient to establish probable cause to believe that the magnets and schematics were export-controlled.  (D.N. 87)  The government opposed the motions (D.N. 105; D.N. 111), and the Court heard oral argument on these and other pretrial motions on April 18, 2024.  (D.N. 177)  Although the motion to dismiss and motion to suppress raise distinct bases for relief, each relies on the same interpretation of a regulatory provision, and the Court will therefore resolve both in the same Memorandum Opinion.  After careful consideration, the Court will deny the motions for the reasons set out below.

**I.**

The Second Superseding Indictment alleges that the defendants exported "approximately 70 drawings containing export-controlled technical data to Chinese Company 1 without a license

1

as required by law and in violation of the law, specifically the International Traffic in Arms Regulations ("ITAR")."  (D.N. 73, PageID.455, ¶ 6)  The technical data related to magnets that Quadrant produced for defense contractors and the Department of Defense.  (*Id.*, PageID.454-55 ¶¶ 1-6)  As part of its investigation into the defendants' conduct, the government obtained and executed a search warrant in 2018 (*see* D.N. 87-1) and four more warrants after the indictment was returned in 2022.  (D.N. 87-2; D.N. 87-3; D.N. 87-4; D.N. 87-5)  These warrants sought evidence of alleged ITAR violations, and the 2022 warrant affidavits largely depended on emails obtained through the 2018 warrant to establish probable cause for export violations.  (D.N. 87-1, PageID.650; D.N. 87-2, PageID.701, 736-49 ¶¶ 108(b)-(nnn))  Both the ITAR counts of the Second Superseding Indictment and the probable-cause determinations for the 2018 and 2022 warrants rest, at least in part, upon the operation of the "specially designed" provision of ITAR, explained below.

The Arms Export Control Act (AECA) and its implementing regulations, ITAR, require individuals and businesses to obtain export licenses before exporting defense articles listed on the United States Munitions List (USML), including technical data that is related to defense articles. 22 U.S.C. § 2778(b)(2); 22 C.F.R. §§ 120.1, 120.17, 121.1.  Many items are explicitly designated as ITAR-controlled on the USML.  *See, e.g.*, § 121.1 Category I(a) ("Firearms using caseless ammunition.").  The USML also lists "[p]arts, components, accessories, and attachments specially designed" for military equipment, including aircraft.  § 121.1 Category VIII(h)(1).  If parts are specially designed for use in defense articles listed on the USML, then they are also ITAR-controlled.  *See* 22 C.F.R. § 120.41.  The parties agree that Quadrant Magnetics' magnets are not enumerated on the USML and are ITAR-controlled, if at all, because they are "specially designed" within the meaning of § 120.41.  (D.N. 88, PageID.994 (challenging whether any party "has any

reliable means of telling whether [the exported] drawings depict magnets that are 'specially designed' and thus controlled"); D.N. 111, PageID.1439 (arguing that "Defendant Quadrant Magnetics produced specially designed magnets for use in a host of military items"))

The Department of State has adopted a "catch and release" approach to determining whether a part, component, accessory, or attachment is "specially designed" and thus a defense article on the USML that can only be exported with a license. *See Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform*, 78 Fed. Reg. 22740, 22744 (Apr. 16, 2013). The regulations define any item that is "a part, component, accessory, attachment, or software for use in or with a defense article" as specially designed in § 120.41(a), and then remove items caught under § 120.41(a) from the USML if they meet one of five exceptions set forth in § 120.41(b). Defendants' motions pertain to the third of the five exceptions, which excludes from the USML an item that would otherwise be specially designed if it "[h]as the same function, performance capabilities, and the same or equivalent form and fit as a commodity or software used in or with a commodity that: (i) [i]s or was in production (i.e., not in development); and (ii) [i]s not enumerated on the USML." § 120.41(b)(3). The parties describe this third exception as applying when there was a "commercial equivalent" to the allegedly specially designed article in production when the article was exported. (D.N. 88 ("a part is 'specially designed' only if there is no commercial equivalent"); D.N. 111, PageID.1456) As the defendants acknowledge, regulated entities are required to determine whether their items are ITAR-controlled but may apply for a "commodity jurisdiction determination" (CJD) from the State Department if they are unsure whether an item is on the USML. (D.N. 88, PageID.992)

## II.

Defendants move to dismiss the ITAR and AECA allegations as unconstitutionally vague as applied to their magnets, arguing that it is too difficult to determine whether the magnets had commercial equivalents and that they were therefore not on notice that the law proscribed their conduct.  (D.N. 88, PageID.989-90)  They also move to suppress the ITAR and AECA-related evidence obtained through the 2018 and 2022 warrants, arguing that the warrant affidavits were insufficient to establish probable cause for the searches because the affidavits did not include the commercial-equivalent analysis described above.  (D.N. 87, PageID.643)  Underlying both motions is the assumption that the absence of a commercial equivalent is an element of every ITAR violation under the "specially designed" provision.  The Court will address this assumption before considering each motion in turn.

### A.   Commercial-Equivalent Exception as Element or Affirmative Defense

### 1.   Commercial-Equivalent Exception

The first issue raised by the defendants' motions is whether the absence of a commercial equivalent is an element of the offense or whether the presence of a commercial equivalent is an affirmative defense that a defendant may assert to establish that a component is not specially designed.  Having reviewed the applicable case law, the structure of the "specially designed" provision of ITAR, and the practical application of ITAR as a whole, the Court concludes that the commercial-equivalent exception is best understood as creating an affirmative defense.[1]

---

[1] An attorney for the government stated during oral argument that the absence of a commercial equivalent is an element of the offense charged in this action.  (*See* D.N. 177, PageID.2417-18)  As explained below, the Court cannot agree that this is the proper reading of the regulatory provision.  Moreover, the government has consistently argued in briefing that it does not need to disprove the existence of a commercial equivalent to convict the defendants, indicating that its position is that the exception gives rise to an affirmative defense.  (*See* D.N. 105, PageID.159 (arguing that the absence of commercial-equivalent analysis in the affidavit is irrelevant to

In the Sixth Circuit, statutory and regulatory exceptions are generally understood to create affirmative defenses. *See United States v. Marcinkewciz*, 543 F. App'x 513, 516 (6th Cir. 2013) (holding that the 'practitioner exception' to liability for manufacturing marijuana creates an affirmative defense, noting "the well-established rule of criminal statutory construction that an exception set forth in a distinct clause or provision should be construed as an affirmative defense and not as an essential element of the crime" (quoting *United States v. Santos-Riviera*, 183 F.3d 367, 370-71 (5th Cir. 1999))); *United States v. Mabry*, 518 F.3d 442, 446 (6th Cir. 2008) (interpreting Taft-Hartley Act exceptions to the Act's general prohibition of payments by employers to union organizers as creating affirmative defenses to prosecutions for violations of the Act); *United States v. Shurelds*, 173 F.3d 430 (6th Cir. 1999) (rejecting a vagueness challenge to the Clean Air Act based on an exception, holding that "[e]xceptions from criminal prohibitions are generally construed as affirmative defenses") (table decision); *United States v. Smith*, 981 F.2d 887, 891 (6th Cir. 1992) (holding that the antique-firearm exception to carrying a firearm in relation to a crime of violence "is an affirmative defense which must be raised by a criminal defendant" and that the defendant bears the burden of raising the exception before the burden shifts to the government to disprove its application). As in many of the statutes at issue in those cases, the commercial-equivalent exception and the other four exceptions under the "specially designed"

---

probable cause because the affiant need not "rule out a suspect's innocent explanation for suspicious facts"); D.N. 111, PageID.1438 (describing § 120.41(b) as creating "narrow exceptions to the rule that provide objective criteria for industry to apply" with "objective criteria that can be applied to decontrol an item even if it was designed for use in a defense article"); D.N. 177, PageID.2417-18 (describing the defense argument that the government must disprove the existence of a commercial equivalent as "advancing a completely unreasonable interpretation of what the (b)(3) provision requires, ignoring both the regulatory context, the statutory purpose, and the administrative safe harbors that exist"))

provision are found in a distinct subsection separate from the general definition, indicating that they too create affirmative defenses.  *See Mabry*, 518 F.3d at 446.

Other circuits have applied this interpretive principle to provisions of the ITAR and have universally concluded that exceptions to USML definitions constitute affirmative defenses rather than elements of an AECA offense.  In *United States v. Sun*, the Fourth Circuit interpreted a regulatory "scrap exemption" to the USML, which stated that arms and ammunition are no longer on the USML and therefore are under the jurisdiction of the Department of Commerce "if they have been rendered useless beyond the possibility of restoration."  278 F.3d 302, 310-11 (4th Cir. 2002).  The *Sun* court rejected the defendants' argument that the government was obligated to prove the inapplicability of the scrap exemption, holding instead that the "'scrap exemption' theory advanced by the Suns and All Ports is an affirmative defense, not an element of a charge under the AECA."  *Id.* at 312.  The Fourth Circuit relied on an earlier Second Circuit case that held that the official-use and foreign-assistance exceptions created affirmative defenses rather than elements of an AECA offense.[2]  *See id.* (analyzing *United States v. Durrani*, 835 F.2d 410, 419-22 (2d Cir. 1987)).  The Eighth Circuit has similarly indicated that a predecessor to the commercial-equivalent exception creates an affirmative defense.  *See United States v. Gregg*, 829 F.2d 1430, 1438 (8th Cir. 1987) (considering defendant's argument that the items they exported were "legitimated as items 'in normal commercial use'" and concluding that "[t]he exemption from a State Department license is limited, therefore, to *components . . . which are in normal commercial use*.  The 'plain

---

[2] The official-use and foreign-assistance exceptions are set out in 22 U.S.C. § 2778(b)(2), which prohibits exporting or importing defense articles without a license "except that no license shall be required for exports or imports made by or for an agency of the United States government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means."  § 2778(b)(2).

6

language' of the exception is so clear that any exporter claiming the exception is applicable . . . does so at his peril." (emphasis in original)).  The defendants here do not point to any unique feature of § 120.41 indicating that it should be treated any differently than other ITAR and USML exceptions and, in particular, its predecessor provision.  (*See* D.N. 88)

The realities of the ITAR scheme also support the conclusion that a defendant bears the burden of establishing that an exception under § 120.41(b) applies to remove an allegedly specially designed article from ITAR control.  As the defendants admit, exporters are responsible for determining whether an item is ITAR-controlled, with a safe harbor for those exporters who, when unsure whether an article is on the USML, receive a commodity jurisdiction determination stating that no license is required to export the article.  (D.N. 88, PageID.992 ("U.S. persons and companies are generally responsible for self-determining whether their items are covered by the USML.  The commodity-jurisdiction procedure is used if doubt exists as to whether an item is covered by the USML."))  The self-regulating structure of the ITAR scheme indicates that regulated entities bear the burden of establishing that a § 120.41(b)(3) exception applies.  As the government states in its response, "[i]f the potential exporter is not aware of, or cannot find, another part that is a potential commercial equivalent, then they are left with no doubt that the part they intend to export is controlled under the USML."  (D.N. 111, PageID.1456)

This interpretation of the commercial-equivalent exception is in keeping with how the other § 120.41(b) exceptions operate, as well.  The two "development" exceptions, § 120.41(b)(4) and (b)(5), require regulated entities to keep and produce certain records to prove that the component was developed for use in commodities not on the USML.  § 120.41(b).  Defendants acknowledge as much in their motion to dismiss, recognizing that a component used in an item on the USML

defaults to being specially designed unless the designer produced the required records.[3]   (D.N. 88, PageID.997-98) ("For (4) and (5), there must be contemporaneously created supporting documentation; otherwise, the item defaults to ITAR-controlled status.")   The defendants' claim that "Release (3) has no default setting" ignores the structure and function of § 120.41: as defendants recognize for all but one exception, the 'catch' of § 120.41(a) creates a default that any component meeting its requirements is ITAR-controlled, while the 'release' of § 120.41(b) allows exporters to establish exceptions to that default and take a component out of ITAR control.   *See* § 120.41; *Sun*, 278 F.3d at 312; *Gregg*, 829 F.2d at 1438.   The default setting for purposes of the commercial-equivalent exception is the same as for the other § 120.41(b) exceptions: ITAR control.

Although this is a case of first impression, several other circuits have rejected similar attempts to cast exceptions under ITAR and the USML as elements of an AECA offense and have held instead that the exceptions create affirmative defenses.   *See Smith*, 981 F.3d at 891-92; *Gregg*, 829 F.2d at 1438; *Durrani*, 835 F.2d at 419-22.   These cases align with the Sixth Circuit's approach to interpreting statutory exceptions.   *See Smith*, 981 F.2d at 891-92.   And this understanding of the

---

[3] In focusing solely on the commercial-equivalent exception, the defendants implicitly agree that the government is not required to disprove each of the "specially designed" exceptions.   Their motion to suppress, for instance, argues only that the affidavits did not include the commercial-equivalent analysis and does not take issue with the omission of the other four exceptions.   (*See* D.N. 87, PageID.643)   The defendants have elsewhere claimed that "[t]he other half of the [specially designed] test . . . is whether the item has a commercial equivalent," wholly disregarding the other exceptions.   (D.N. 91, PageID.1040 (moving to exclude expert testimony regarding ITAR and AECA violations))   The defendants have never articulated a reason for giving greater significance to their preferred exception than to the other exceptions, and the government casts this preferential treatment of the commercial-equivalent exception as an "attempt to elevate the probable cause standard required for a search warrant based upon Defendants' own theory of the case."   (D.N. 105, PageID.1348)   The defendants' focus on the commercial-equivalent exception as the basis for four of the pretrial motions (D.N. 87; D.N. 88; D.N. 91; D.N. 143) demonstrates that they believe the exceptions only become an issue once there is evidence that an exception might apply: in other words, that they are affirmative defenses.

commercial-equivalent exception is in line with how ITAR functions in practice and the agreed-upon operation of the other § 120.41 exceptions.  Thus, § 120.41(b)(3) creates an affirmative defense that the defendants may assert to establish that their magnets were not specially designed and are thus not ITAR-controlled.

### 2.    Effect on Defendants' Motions

Having concluded that the commercial-equivalent exception, like the other § 120.41(b) exceptions, creates an affirmative defense, the Court must now consider the effect of that interpretation on the defendants' motions.

To survive a vagueness challenge and afford defendants due process, a statute or regulation "must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  The defendants argue that § 120.41 is unconstitutionally vague as applied to their magnets because—they claim—it is too difficult to disprove the existence of a commercial equivalent to an allegedly simple part like a magnet.  (D.N. 88)  But because the exception creates an affirmative defense, no party bears a burden to "check every neodymium or samarium-cobalt magnet ever used in a commercial product," as the defendants allege.  (D.N. 88, PageID.998)  Rather, exporters are required to obtain a license to export a component that is used with or in a defense article on the USML unless they can establish that a § 120.41(b) exception applies, including whether they can point to a commercial equivalent item in production.  *See* § 120.41; *Sun*, 278 F.3d at 312; *Gregg*, 829 F.2d at 1438.  The regulation therefore gives fair notice to regulated entities like Quadrant and its employees of what conduct is forbidden.  *See Fox*, 567 U.S. at 253; *see also Shurelds*, 173 F.3d 430 (holding that since a provision of the Clean Air Act created an affirmative defense, it did not add a conflicting substantive requirement that rendered the statute unconstitutionally vague).

The motion to suppress is likewise undermined by the conclusion that the presence of a commercial equivalent is an affirmative defense. The Sixth Circuit has held that officers do not need to negate an affirmative defense to establish probable cause for an arrest, although it has not applied this precedent in the context of probable cause for a search warrant. *See United States v. Reed*, 220 F.3d 476, 479 (6th Cir. 2000) (rejecting the defendant's argument that the arresting officer was required to negate his affirmative defense before establishing probable cause and holding that the Sixth Circuit "does not require such an added inquiry to the probable cause determination."). District courts within the Circuit have applied this principle to find that the possible existence of an affirmative defense to the suspected criminal activity is irrelevant to the finding of probable cause for a search warrant. *See, e.g. United States v. Fieck*, 54 F. Supp. 3d 841, 844 (W.D. Mich. 2014); *United States v. Ellis*, 910 F. Supp. 2d 1008, 1017 (W.D. Mich. 2012). Accordingly, the warrant affiants in 2018 and 2022 were not required to negate the commercial-equivalent affirmative defense to establish probable cause for the ITAR and AECA violations. *See Reed*, 220 F.3d at 479; *Fieck*, 54 F. Supp. 3d at 844.

Although interpreting the commercial-equivalent exception as an affirmative defense rather than an element resolves most of the issues raised in Defendants' motions, each motion nevertheless merits further discussion. The Court will therefore consider each motion in turn.

**B.      Motion to Dismiss ITAR and AECA Allegations**

"Vagueness challenges that do not involve First Amendment freedoms must be analyzed as applied to the specific facts of the case at hand." *United States v. Theunick*, 651 F.3d 578, 585 (6th Cir. 2011). As applied to the facts of the case, the statute or regulation must define the offense with enough detail "first, that regulated parties . . . know what is required of them so they may act accordingly; [and] second, . . . that those enforcing the law do not act in an arbitrary or

discriminatory way." *Fox*, 567 U.S. at 253. Although a statute must "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," exact precision is neither required nor to be expected. *Theunick*, 651 F.3d at 585 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)). Rather, "[i]t is fair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Id.* (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952)) (internal quotation marks omitted).

Courts have universally rejected vagueness challenges to AECA and ITAR. *See United States v. Zhen Zhou Wu*, 711 F.3d 1 (1st Cir. 2013) (rejecting vagueness challenge in part because the ITAR category at issue "explicitly excludes items 'in normal commercial use'" (quoting 22 C.F.R. § 121.1(C)(XI)(c))); *United States v. Hsu*, 364 F.3d 192, 196 (4th Cir. 1992) (upholding a provision that placed items under ITAR control if they were "specifically designed or modified for military purposes . . . . *and* (1) have no 'predominant civil application[]' or 'performance equivalent' used for civil applications."); *Sun*, 278 F.3d 302; *United States v. Lee*, 183 F.3d 1029 (9th Cir. 1999); *Gregg*, 829 F.2d 1430; *United States v. Swarovski*, 592 F.2d 131 (2nd Cir. 1979) (rejecting vagueness challenge to predecessor statute to AECA). They have done so based on three core features of AECA and ITAR which also shed light on the defendants' challenge here.

First, the statute and regulations apply to sophisticated businesses engaged in a highly regulated activity. "[W]here a criminal statute regulates economic activity, it generally 'is subject to a less strict vagueness test, because its subject matter is more often narrow and because businesses can be expected to consult relevant legislation in advance of action.'" *Lee*, 183 F.3d at 1032 (quoting *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989)). The defendants must therefore establish that the commercial-equivalent exception is so vague that businesspeople engaged in the highly regulated industry of developing and manufacturing components for military

equipment would not be on adequate notice that their conduct was, or was likely to be, forbidden. *See Sun*, 278 F.3d at 309.

Second, any ambiguities in the regulations defining ITAR-controlled items are ameliorated by the safe-harbor provision: "the regulation itself provides a means for exporters to verify their own compliance prior to shipping questionable items by consulting the State Department's Office of Defense Trade Controls or the Commerce Department's Office of Exporter Services." *Sun*, 278 F.3d at 311; *Zhen Zhou Wu*, 711 F.3d at 13 ("A manufacturer unsure about whether a particular item is a 'defense article' covered by the Munitions List may file a 'commodity jurisdiction' (CJ) request with the State Department."); *Lee*, 183 F.3d at 1032. Thus, in "the sensitive business of exporting military items, the statute and its implementing regulation more than suffice to put exporters on notice to consult the applicable regulations and, if necessary, contact the appropriate government agency to resolve any perceived ambiguity." *Lee*, 183 F.3d at 1032. Manufacturers of components for military equipment—even purportedly simple components like magnets—can send all available information about the components to the State Department and obtain a CJD that clarifies whether they must obtain a license before sending technical data abroad. *See Sun*, 278 F.3d at 311; *Zhen Zhou Wu*, 711 F.3d at 13. The regulations provide a straightforward system through which regulated entities such as Quadrant may eliminate any uncertainty as to their obligations under ITAR and AECA. *See Lee*, 183 F.3d at 1032.

Finally, AECA only criminalizes the actions of those who willfully violate the statute or its implementing regulations. 22 U.S.C. § 2778(c). The government must prove that "the law imposed a duty on the defendant[s], that the defendant[s] knew of this duty, and that [they] voluntarily and intentionally violated that duty." *United States v. Aaron*, 590 F.3d 405, 408 (6th Cir. 2009) (quoting *Cheek v. United States*, 498 U.S. 192, 201 (1991)). This scienter requirement

remedies any vagueness in the "specially designed" regulations, since the government must prove not only that the items were ITAR-controlled, but also that the defendants knew that fact and chose to export the controlled technical data without a license anyway. *See Hsu*, 364 F.3d at 197 ("It is well-established that such a 'scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.'" (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982))).  In short, for the defendants to be convicted, the government must prove that they were in fact on notice that the law proscribed their conduct.[4]  *See id.*; *see also Sun*, 278 F.3d at 309 (holding that the AECA and ITAR provisions at issue were not unconstitutionally vague because they governed a highly regulated industry and because the scienter requirement mitigated any vagueness regarding notice that the conduct was illegal).

The defendants acknowledge that courts have rejected vagueness challenges to AECA and ITAR on these grounds.  (D.N. 88, PageID.994)  They seek to distinguish their motion by emphasizing the factual difficulty of determining whether there are commercial equivalents to their magnets, based on the alleged simplicity of the magnets' design.[5]  (*Id.*, PageID.994, 999)  Yet "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved[,] but rather the indeterminacy of precisely what that fact is.'"  *United States v. Paull*, 551 F.3d 516, 525 (6th Cir. 2009); *Fox*, 567

---

[4] The government emphasized the scienter requirement and the availability of the CJD system at oral argument.  According to the government, the motion to dismiss asks the Court to "completely ignore everything that the framework provides that they could have done to avoid finding themselves in this situation they now find themselves [in] and . . . . their challenge to vagueness at this juncture should come with little grace."  (D.N. 177, PageID.2417 (citing *Swarovski*, 592 F.2d 131))

[5] This factual difficulty is largely resolved once the commercial-equivalent exception is understood as creating an affirmative defense, because no party bears the burden of disproving the possible existence of a commercially available magnet that is the equivalent to Quadrants' products.

U.S. at 253 ("As this Court has explained, a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." (citing *United States v. Williams*, 553 U.S. 285, 304 (2008))).  Defendants admit that they "do not challenge any aspect of the AECA itself as vague, nor complain that the language of the 'specially designed' provision is incomprehensible."  (D.N. 88, PageID.994)  Although the defendants successfully distinguish their argument from the vagueness challenges that courts have consistently rejected, they do so by pointing out that they are not challenging the vagueness of the statute at all.  *See Fox*, 567 U.S. at 253.  The defendants may raise their factual claims at trial, to the extent that they are not resolved by understanding the commercial-equivalent exception as an affirmative defense, but the arguments cannot justify dismissing the charges as unconstitutionally vague.  *See Fox*, 567 U.S. at 253; *Paull*, 551 F.3d at 525.

## C.     Motion to Suppress Evidence of Alleged ITAR and AECA Violations

The defendants also argue that evidence related to the ITAR and AECA counts obtained under warrants issued in 2018 and 2022 must be suppressed.  (D.N. 87)  According to the defendants, the affidavits in support of the 2018 and 2022 warrants lacked sufficient particularized information to support probable cause because they merely related that the Department of State had concluded that the drawings were ITAR-controlled without describing the methodology applied by the Department of State in reaching that conclusion, in particular whether the agency had determined that there were no commercial equivalents.  (D.N. 87, PageID.643-44)  The government urges the Court not to reach the merits of the defendants' argument, asserting that the defendants did not have a reasonable expectation of privacy in the places to be searched pursuant to the 2022 warrants.  (D.N. 105, PageID.1354-56)  In the alternative, the government argues that the warrants were sufficient to support probable cause for the searches.  (*Id.*, PageID.1356-1360)

14

The Court need not reach the issue of the defendants' expectation of privacy in the targets of the 2022 searches because the affidavits established probable cause for the searches, as explained below. *See Byrd v. United States*, 584 U.S. 395, 397 (2018) (holding that the court below had discretion as to the order in which to address the remanded questions of whether the defendant had a reasonable expectation of privacy in the vehicle searched and whether, even if the defendant could object to the search, there was probable cause for the search).

"Probable cause is not a high bar" and "demands only a 'fair probability' of criminal activity." *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)). Probable cause requires "less than *prima facie* proof but more than mere suspicion." *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). Moreover, "reviewing courts are to accord the magistrate's determination 'great deference' . . . . [S]o long as the magistrate [judge] had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

With these standards in mind, the Court will consider the substance of the affidavits submitted to support the 2018 and 2022 warrants, respectively.

### 1.    2018 Warrant Affidavit

The defendants argue that the 2018 warrant affidavit was fatally flawed because it relied on a State Department commodity jurisdiction determination, and the defendants assert that the State Department's "conclusory statements that Quadrant's magnets and related technical data are on the USML do *not* mean those items are actually on the list nor that they fall under ITAR's jurisdiction." (D.N. 87, PageID.643 (emphasis in original)) According to the defendants, Special

Agent James McCartney, the warrant affiant, was required to corroborate the State Department's commodity jurisdiction determination and provide the underlying analysis for a finding of ITAR jurisdiction, including whether the agency had ruled out the existence of commercial equivalents. (D.N. 87, PageID.644 (citing *United States v. Waide*, 60 F.4th 327, 336 (6th Cir. 2023)))  But McCartney was not repeating the claims of an anonymous informant that require corroboration to be reliable, as was the case in the opinion cited by the defendants.  *Cf. Waide*, 60 F.4th at 336 (finding statement of unidentified person, relayed to the affiant by a third party who heard it from an unidentified property owner, was insufficient to establish probable cause because in "the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration." (quoting *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005))).  Instead, he was repeating the conclusions reached by the federal agency tasked with enforcing AECA after GE Aviation requested a commodity jurisdiction determination to confirm whether an export violation had occurred.  (*See* D.N. 87-1, PageID.665 ¶¶ 39-40)

A warrant affidavit "must contain adequate facts about the underlying circumstances to show that probable cause exists[;] [h]owever, '[t]hese supporting facts need not be based on the direct knowledge and observations of the affiant, but may also come from hearsay information.'" *United States v. Hampton*, 504 F. App'x 402, 404 (6th Cir. 2012) (quoting *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)).  And "observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."  *United States v. Luna*, 525 F.2d 4, 9 (6th Cir. 1975) (quoting *United States v. Ventresca*, 380 U.S. 102, 111 (1965)).  Thus, a warrant affiant may establish probable cause by relaying that another government officer has concluded that a violation occurred, without corroborating that conclusion or providing any further analysis.  *See United States v. Lapsins*, 570

F.3d 758, 764 (6th Cir. 2009) ("[I]n general, another law enforcement officer is a reliable source and . . . consequently no special showing of reliability need be made as a part of the probable cause determination." (citation and internal quotation marks omitted)); *Luna*, 525 F.2d at 9.  The affidavit need not describe the methodology applied by the other agency or officer in reaching that conclusion because the statement is inherently reliable.  *See Lapsins*, 570 F.3d at 764 (concluding that the affidavit's statement that "the NCMEC, which has expertise in child pornography, 'analyzed' the image and informed [the affiant] that it was a photograph of an identified victim" was sufficient to establish probable cause, without describing what that analysis entailed).

Here, the warrant affiant was entitled to rely on hearsay statements to establish probable cause for an ITAR violation.  *See Hampton*, 504 F. App'x at 404.  Since the hearsay statements at issue are determinations of the government officers responsible for enforcing ITAR, they are inherently reliable, and the affiant did not need independently to perform the underlying analysis or describe the basis for the CJDs.  *See Luna*, 525 F.2d at 9; *Lapsins*, 570 F.3d at 764; *see also* 22 C.F.R. § 120.12.

Even if the defendants were correct that the commodity jurisdiction determination was not a proper basis for probable cause, a review of the 2018 warrant affidavit reveals that it provides more than enough particularized information to support the magistrate judge's finding of probable cause.  The affidavit reports that GE Aviation sent specifications for part number FP24018P1 to Quadrant Magnetics with the warning that the data was ITAR-controlled and that Quadrant therefore could not transfer the data to a non-US person without a license.  (D.N. 87-1, PageID.672 ¶ 53)  The affidavit also described an email sent by defendant Scott Tubbs to GE Aviation reporting that Quadrant Magnetics had sent the technical data associated with FP24018P1—which GE Aviation had told Quadrant was ITAR-controlled—to Quadrant's Chinese business partner.  (*Id.*,

PageID.673 ¶ 55)  From these facts, the magistrate judge could make the "practical, common-sense decision" that there was probable cause to believe that Quadrant and its employees had knowingly exported ITAR-controlled technical data to China in violation of AECA.  *United States v. Smith*, 510 F.3d 641, 652 (6th Cir. 2007).

### 2.    2022 Warrant Affidavits

Defendants similarly argue that the 2022 warrant affidavits were insufficient because "the affiant made no inquiry and offered no evidence to support the conclusion that the noted drawings were for magnets that were actually on the USML and subject to the ITAR."  (D.N. 87, PageID.638)  This argument is again based on the assertion that the affiant failed to establish that the magnets had no commercial equivalent and that without performing the commercial-equivalent analysis, the affidavit could not establish probable cause to believe that an ITAR violation occurred.[6]  (*Id.*, PageID.643)

The Court need not reach the details of the warrant affidavit because the 2022 warrants differ from the 2018 warrant in an important respect: the defendants had already been indicted in this case when the 2022 warrant affidavits were filed.  (D.N. 87-2, PageID.749 ¶ 112)  The Sixth Circuit has long held that "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause."  *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002); *see Sanders v. Jones*, 845 F.3d 721, 732 (6th Cir. 2017) ("[I]t is well-established in this circuit that an indictment by a grand jury conclusively determines the existence of probable cause."); *Bakos v. City of Olmsted Falls*, 73 F. App'x 152, 157 (6th Cir. 2003) (noting

---

[6] The warrant affidavit includes an extensive probable-cause statement regarding alleged immigration-law violations by Quadrant, its owner, and related individuals and entities.  (D.N. 87-2, PageID.708-34 ¶¶ 19-98)  The defendants' motion to suppress focuses only on the probable cause for export-law violations.  (D.N. 87; *see* D.N. 87-2, PageID.734-49 ¶¶ 99-112)

that "*Higgason* states the controlling federal standard in this Circuit" for the weight given to a valid indictment in finding probable cause for indicted conduct).  The magistrate judge was therefore entitled to rely upon the grand jury's finding of probable cause that the defendants had violated ITAR and AECA, without considering whether the warrant affidavit was independently sufficient to establish probable cause for believing that criminal violations had occurred.  *See Higgason*, 288 F.3d at 877.

Even if probable cause depended on the sufficiency of the warrant affidavit, the magistrate judge had a substantial basis for concluding that the defendants violated ITAR and AECA by sending technical data to Chinese individuals and businesses.  The 2022 affidavit describes in detail the investigative steps taken in executing the 2018 warrant and developing the evidence obtained through that warrant to determine that the defendants had likely violated ITAR and AECA.  (D.N. 87-2, PageID.735-106 ¶¶ 102-107)  These steps included determining that the magnets were being manufactured for use in defense articles (*id.*, PageID.735 ¶ 103), requesting and receiving multiple CJDs that concluded the magnets were specially designed for use in those articles and thus ITAR-controlled (*id.*, PageID.735-36 ¶¶ 104-106), and performing a license-and-registration history check to determine that Quadrant had not received licenses to export the schematics.  (*Id.*, PageID.736 ¶ 107)  As discussed above, the uncorroborated conclusions of the agency tasked with enforcing ITAR and AECA that the drawings that the defendants allegedly sent to China were ITAR-controlled are sufficient to establish probable cause for export violations.  *See Lapsins*, 570 F.3d at 764.  Even if they were not, however, the affidavit includes descriptions of extensive evidence collected as a result of the 2018 warrant, which provide further grounds for the magistrate judge's finding of probable cause.  (D.N. 87-2, PageID.736-49 ¶¶ 108(b)-(nnn))

19

According to the affidavit, the 2018 search produced several emails sent by Quadrant employees, often Tubbs or Phil Pascoe, to Chinese business partners that included magnet schematics marked as ITAR-controlled.  (*Id.*, PageID.737, 740, 744-49 ¶¶ 108(f), (q), (r), (mm), (oo), (qq), (ww), (aaa), (ggg), (iii), (lll))  The affidavit also describes an email by Quadrant customer General Dynamics warning Quadrant not to send attached drawings internationally because they were ITAR-controlled and an email from Quadrant sending the same drawings to China.  (*Id.*, PageID.737 ¶ 108(e); *see* PageID.737-38 ¶¶ 108(f) (sending the schematic described in (e) to X-Mag in China))  The fact that the 2018 warrant had uncovered so many emails by the defendants sending technical data marked as ITAR-controlled to Chinese individuals and entities provided the magistrate judge with a substantial basis for concluding that the 2022 search warrants would produce further evidence of the charged conduct.  *See Allen*, 211 F.3d at 973.

Three other emails described in the affidavit could demonstrate that the Quadrant employees who sent the schematics to China knew that they were ITAR-controlled and that exporting the drawings without a license was prohibited.  In the first, Defendant Tubbs told Defendant Phil Pascoe to "redraw this print for export reasons."  (*Id.*, PageID.736, ¶ 108(b))  In the second, GE Aviation carbon-copied defendants Tubbs and Phil Pascoe on an email to the Department of State acknowledging that Quadrant had sent magnet schematics to China and that GE Aviation had obtained a CJD concluding that the magnets were specially designed.  (*Id.*, PageID.745 ¶ 108(ss))  Finally, Phil Pascoe emailed Tubbs a spreadsheet, created by Monica Pascoe, indicating the General Dynamics parts that had ITAR prints.  (*Id.*, PageID.747)  These emails support a practical, common-sense conclusion that there was probable cause to believe the defendants willfully violated ITAR.  *See Smith*, 510 F.3d at 652; *Allen*, 211 F.3d at 973.

**III.**

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is

hereby

**ORDERED** that the motion to dismiss the ITAR and AECA allegations (D.N. 88) and the

motion to suppress (D.N. 87) are **DENIED**.

July 9, 2024

**David J. Hale, Judge**
**United States District Court**

21