UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,                                                    Plaintiff,

v.                                                    Criminal Action No. 3:22-cr-88-DJH

PHIL PASCOE (1),
SCOTT TUBBS (2),
MONICA PASCOE (3), and
QUADRANT MAGNETICS, LLC (4),                                          Defendants.

* * * * *

## MEMORANDUM OPINION AND ORDER

Defendants Phil Pascoe, Scott Tubbs, Monica Pascoe, and Quadrant Magnetics, LLC move to dismiss allegations that they violated the Arms Export Control Act (AECA) and its implementing regulations, the International Traffic in Arms Regulations (ITAR), arguing that the regulatory provisions at issue violate the First and Fifth Amendments.  (Docket No. 218; D.N. 219)  Specifically, Defendants move to dismiss Counts 5, 6, 7, and 8, as well as paragraphs 16(a)–(b), 17(b)–(c), and 18(c)–(v) of Count 1 of the Second Superseding Indictment.  (D.N. 218; D.N. 219)  In doing so, Defendants urge the Court to hold unenforceable as unconstitutional the United States Munitions List (USML) categories identified in the indictment: Category XII(f) and Category XX(d).  (D.N. 218, PageID.2859; D.N. 219, PageID.2904)  The United States opposes the motions.  (D.N. 239; D.N. 242)  After careful consideration, the Court will deny Defendants' motions for the reasons set out below.

## I.    BACKGROUND

Pursuant to the AECA, "[i]n furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services."  22 U.S.C. § 2778(a)(1).  The AECA provides that,

subject to various exceptions, "no defense articles or defense services . . . may be exported or imported without a license for such export or import." *Id.* § 2778(b)(2). The United States Department of State promulgated the ITAR to effectuate the AECA. *See id.* § 2778(b)(2); 22 C.F.R. §§ 120–130. The ITAR includes the United States Munitions List (USML), which enumerates the "defense articles" subject to the AECA's export controls. *See* 22 U.S.C. § 2778(a)(1); *see also* 22 C.F.R. § 121.1. Pursuant to the AECA and ITAR, individuals and businesses must receive a license from the Department of State before exporting an item designated on the USML unless an exemption is applicable. *See* 22 C.F.R. § 120.14; 22 U.S.C. § 2778(b)(2).

Although many items are explicitly designated as "defense articles" on the USML, *see, e.g.*, 22 C.F.R. § 121.1 Category XX(a), the USML also includes "[t]echnical data . . . directly related to . . . defense articles."[1] *See e.g., id.* § 121.1 Category XX(d). The ITAR defines "technical data" as "information . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles." *Id.* § 120.33(a)(1). This definition expressly encompasses "information in the form of blueprints, drawings, photographs, plans, instructions, or documentation." *Id.*

The AECA and ITAR also include several exemptions from the regulatory regime's technical-data licensing requirements. For example, the ITAR's definition of technical data excludes "information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities," as well as "basic marketing information on function or purpose or general system descriptions of defense articles." *Id.* § 120.33(b). The

---

[1] Parties who are unsure whether a particular item is a defense article covered by the USML may file a commodity jurisdiction determination request with the Directorate of Defense Trade Controls (DDTC), an agency of the State Department. *See* 22 C.F.R. §§ 120.4, 120.12.

definition likewise excludes information in the "public domain," *id.*, meaning "information which is published and which is generally accessible or available to the public" through "sales at newsstands and bookstores," "libraries," or "patents," among other means. *Id.* § 120.34. The ITAR also contains various exemptions for technical data used to promote collaboration with allies of the United States in the development of defense technologies. *See, e.g.*, *id.* § 125.4(b)(3) (technical data in furtherance of contract with U.S. government agency); § 125.4(b)(9) (technical data shared within a U.S. company abroad); § 125.4(b)(10) (disclosures of technical data by U.S. institutions of higher learning to foreign persons).

Due to the AECA's "foreign affairs function," its implementation is "highly discretionary." *Id.* § 128.1. For example, the United States may deny or revoke an export license for a wide variety of reasons. *See, e.g.*, *id.* § 120.18(a)(1) (allowing licensing decisions to be based on the Department of State's determinations regarding world peace, national security, and foreign policy); *id.* § 120.20 (granting the Secretary of State authority to revoke, suspend, or amend export licenses "whenever such action is deemed to be advisable"). This discretion is not unbridled, however: to further the AECA's national-security goals,

> [d]ecisions on issuing export licenses . . . shall take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

22 U.S.C. § 2778(a)(2).

The Second Superseding Indictment alleges that the defendants exported "approximately 70 drawings containing export-controlled technical data to Chinese Company 1 without a license," in violation of the AECA and ITAR. (D.N. 73, PageID.455 ¶ 6; *see generally id.*, PageID.456–64 ¶¶ 9–18) Specifically, the Second Superseding Indictment alleges that the

3

drawings constituted "technical data directly related to defense articles described in Category XX (Submersible Vessels and Related Articles) and Category XII (Fire Control, Laser, Imaging, and Guidance Equipment) of the USML." (*Id.*, PageID.457 ¶ 13)  Based on this alleged conduct, the Second Superseding Indictment charges Defendants Phil Pascoe, Tubbs, and Quadrant Magnetics with four counts of Exporting Technical Data Without a License (*id.*, PageID.465–68 ¶¶ 21–28) and all Defendants with conspiring to do so.[2]  (*Id.*, PageID.458–64 ¶¶ 15–18)

Now, Defendants move under Federal Rule of Criminal Procedure 12(b) to dismiss the Second Superseding Indictment's allegations regarding the export of the drawings, arguing that those charges rest on unconstitutional regulatory provisions.  (D.N. 218; D.N. 219)  Specifically, Defendants contend that the AECA and ITAR's licensing requirements for technical data violate the First Amendment as a prior restraint on speech and that they are facially overbroad and unable to satisfy strict scrutiny.  (D.N. 218, PageID.2841–59)  In addition, Defendants argue that the ITAR's regulation of technical data "directly related" to defense articles is unconstitutionally vague under the Fifth Amendment.  (D.N. 219, PageID.2893–904)  In response, the United States maintains that the AECA and ITAR's licensing requirements satisfy intermediate scrutiny, are not unconstitutional prior restraints, and are not overbroad.  (D.N. 242, PageID.3436–53)  Moreover, the government asserts that Defendants had actual knowledge that the exported drawings were ITAR-controlled and therefore cannot properly raise a facial vagueness challenge at this time.  (D.N. 239, PageID.3402–04)  The Court considers each argument below.

---

[2] The Second Superseding Indictment also charges Defendants with wire fraud and additional conspiracy counts based on Defendants' export-related conduct.  (D.N. 73, PageID.458–65 ¶¶ 15–20)  Furthermore, it originally charged Defendants with conspiring to violate and violating the law against smuggling goods from the United States.  (*Id.*, PageID.458–69 ¶¶ 16(b), 29–30)  The Court dismissed the smuggling allegations by previous Order (D.N. 186), and those charges are no longer at issue.

## II.    ANALYSIS

Pursuant to Federal Rule of Criminal Procedure 12, a defendant may seek dismissal based on defects in an indictment.  Fed. R. Crim. P. 12(b)(3)(B); *see also United States v. Ramic*, No. 1:21-CR-00013-GNS-HBB, 2023 WL 8482899, at *1 (W.D. Ky. Dec. 5, 2023).  Relevant here, indictments that allege violation of an unconstitutional statute are defective and may be challenged under Rule 12.  *United States v. Strange*, No. CR 5:23-097-DCR, 2023 WL 8458225, at *2 (E.D. Ky. Dec. 6, 2023); *United States v. Rife*, 429 F. Supp. 3d 363, 366 (E.D. Ky. 2019).  When considering a motion to dismiss an indictment under Rule 12, the Court does "not evaluate the evidence upon which the indictment is based" but instead "review[s] the legal sufficiency of the indictment."  *United States v. Easley*, No. 5:20-CR-1-TBR, 2020 WL 1310486, at *2 (W.D. Ky. Mar. 19, 2020) (quotations omitted).

### A.    First Amendment

Defendants urge the Court to dismiss the portions of the Second Superseding Indictment that implicate the AECA and ITAR's licensing requirements for technical data, arguing that those requirements violate the First Amendment.  (D.N. 218)  Defendants' challenge comes amidst a backdrop of successful prosecutions on similar charges.  *See, e.g.*,  *Liu v. United States*, No. CV 17-7041 (SRC), 2021 WL 3732879, at *4–9 (D.N.J. Aug. 23, 2021) (denying defendant's motion to vacate conviction of exporting technical data designated on the USML without a license); *United States v. Gowadia*, 760 F.3d 989, 990 (9th Cir. 2014) (upholding defendant's conviction of exporting technical data designated on the USML without a license); *United States v. Roth*, 628 F.3d 827, 829 (6th Cir. 2011) (same); *United States v. Hoffman*, 10 F.3d 808, at *6–10 (9th Cir. 1993) (same).  In fact, courts across the country have considered and rejected similar First Amendment challenges to the AECA and ITAR's regulatory regime in both

the criminal and civil contexts. *See, e.g.*, *United States v. Chi Mak*, 683 F.3d 1126, 1134–36 (9th Cir. 2012); *United States v. Posey*, 864 F.2d 1487, 1496–97 (9th Cir. 1989) (citing *United States v. Edler Indus.*, 579 F.2d 516 (9th Cir. 1978)); *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 691–96 (W.D. Tex. 2015), *aff'd*, 838 F.3d 451 (5th Cir. 2016) (denying preliminary injunction against enforcement of the ITAR's prepublication approval requirements sought on First Amendment grounds); *Stagg P.C. v. U.S. Dep't of State*, 354 F. Supp. 3d 448, 469–71 (S.D.N.Y. 2019), *vacated on other grounds*, 983 F.3d 589 (2d Cir. 2020) (rejecting plaintiff's First Amendment challenge to the AECA and ITAR's licensing requirements). Notwithstanding this ample authority, Defendants maintain that the Supreme Court's decision in *Reed v. Town of Gilbert,* 576 U.S. 155 (2015) altered the legal landscape and that dismissal on First Amendment grounds is warranted here. (*See* D.N. 218, PageID.2851)

As an initial matter, it is undisputed that the AECA and ITAR's licensing requirements for technical data, and for the drawings allegedly exported by Defendants, implicate the First Amendment. (D.N. 218, PageID.2843; D.N. 242, PageID.3435–36) The ITAR defines technical data as "information . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles," including "information in the form of . . . drawings." 22 C.F.R. § 120.33(a)(1). Pursuant to the AECA and ITAR, individuals and businesses are generally prohibited from transmitting technical data outside of the United States without a license. *See* 22 U.S.C. § 2778(b)(2); *see also* 22 C.F.R. § 120.50 (defining export to include "transmission out of the United States . . . in any manner"). The Supreme Court has explained that the "dissemination of information [is] speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 636 (1994) (explaining that entities that

6

"engage in and transmit speech" are entitled to First Amendment protection).  Indeed, "[a]ll manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance and the printed word—qualify for the First Amendment's protections."  *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (internal quotations and citations omitted).  And the Supreme Court has applied the First Amendment to speech directed to persons outside of the United States.  *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 25–39 (2010).  In line with these principles and the AECA's regulatory scheme, courts widely recognize that the ITAR's technical-data certification requirements merit some level of First Amendment scrutiny.  *See, e.g.*, *Mak*, 683 F.3d at 1135 (applying intermediate scrutiny); *Stagg*, 354 F. Supp. 3d at 469–70 (same).

The parties dispute what level of scrutiny applies (D.N. 218, PageID.2858; D.N. 242, PageID.3436), and that determination turns on whether the licensing requirements are content-neutral.[3]  *Reed*, 576 U.S. at 163.  "The 'crucial first step in the content-neutrality analysis' involves 'determining whether the law is content neutral on its face.'"  *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020) (quoting *Reed*, 576 U.S. at 165).  The Supreme Court has characterized this as a "commonsense" inquiry that "requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys."  *Reed*, 576 U.S. at 163 (internal quotations omitted).  Laws are content-based when they "cannot be justified without reference to the content of the regulated speech" or are "adopted by the

---

[3] As further discussed below, Defendants primarily argue that the licensing requirements constitute an unconstitutional prior restraint on speech.  (D.N. 218, PageID.2841–53)  The prior-restraint analysis is affected by whether the regulation at issue is content-neutral.  *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322–23 (2002); *see also H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 621 (6th Cir. 2009).  Therefore, the Court must determine content-neutrality before turning to the prior-restraint analysis.

government because of disagreement with the message [the speech] conveys." *Id.* at 164 (internal quotations omitted) (alteration in original). Ultimately, "[b]ecause strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny."[4] *Int'l Outdoor*, 974 F.3d at 703 (alteration in original) (quoting *Reed*, 576 U.S. at 166).

As noted above, other courts considering this issue have consistently concluded that the AECA and ITAR's technical-data licensing requirements are content-neutral. In *Mak*, for example, the Ninth Circuit reasoned that

> the AECA prohibits export without a license of items on the USML without regard to content or viewpoint; it was intended to authorize the President to control the import and export of defense articles and defense services in furtherance of world peace and the security and foreign policy of the United States. . . . Mak's arguments that the AECA and its implementing regulations are content-based mistakenly focus on the nature of the content incidentally restricted, and not the nature of the statute. . . . The purpose of the AECA does not rest upon disagreement with the message conveyed. . . . ITAR defines the technical data based on its *function* and not its viewpoint. . . . Accordingly, we find that the AECA and its implementing regulations are content-neutral.

---

[4] The government asks the Court to apply intermediate scrutiny "for the additional and independent reason that any potentially burdened speech is commercial." (D.N. 242, PageID.3441) The Supreme Court and Sixth Circuit have provided seemingly inconsistent authority as to whether content-based commercial speech is subject to strict scrutiny following *Reed*. *Compare Int'l Outdoor*, 974 F.3d at 703 (internal citation omitted) (the Sixth Circuit explaining that "the intermediate-scrutiny standard applicable to commercial speech . . . applies only to a speech regulation that is content-neutral on its face" and that "a regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*"), *with City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73 (2022) (noting, in dicta, that in a prior case the Supreme Court "did not need to decide whether [an] off-premises prohibition was content based, as it regulated only commercial speech and so was subject to intermediate scrutiny in any event"). Ultimately, however, because the Court concludes that the licensing requirements are content-neutral and subject to intermediate scrutiny, it need not consider the government's arguments relating to commercial speech.

8

*Mak*, 683 F.3d at 1134–35 (internal quotations and citations omitted).  The Western District of Texas reached the same conclusion in *Defense Distributed*, explaining that "[t]he ITAR does not regulate disclosure of technical data based on the message it is communicating" but rather serves "to satisfy a number of foreign policy and national defense goals."  121 F. Supp. 3d at 694. Likewise, the Southern District of New York relied on *Mak* in holding that the AECA and ITAR's licensing requirements for technical data are content-neutral.  *Stagg*, 354 F. Supp. 3d at 469–70.

Defendants attempt to cast *Mak* as "effectively overruled by the Supreme Court's decision in *Reed*," arguing that *Reed* "says a law is content-based if it regulates based on function and *Mak* wrongly said the law is content-neutral if it regulates based on its function." (D.N. 218, PageID.2851 (internal quotations omitted))  But the Supreme Court has cautioned against "stretch[ing] *Reed*'s 'function or purpose' language too far."  *Reagan*, 596 U.S. at 74 (internal quotation omitted).  In fact, the Supreme Court in *Reagan* refused to accept the very reading of *Reed* now employed by Defendants.  *See id.*  The Supreme Court explicitly "reject[ed] . . . the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern."  *Id.* at 73.  After all, as the Supreme Court noted, "First Amendment precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral."  *Id.* at 72. So, although "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a function or purpose proxy that achieves the same result," "[t]hat does not mean that any classification that considers function or purpose is *always* content based."  *Id.* (internal quotations omitted).

"Determining whether a statute is content based is a delicate matter." *Zillow, Inc. v. Miller*, No. 23-5300, 2025 WL 211755, at *8 (6th Cir. Jan. 16, 2025). Ultimately, however, in light of the authorities cited above and the nature of the AECA's regulatory regime, the Court concludes that the licensing requirements for technical data are content-neutral. In reaching this conclusion, the Court is persuaded by the reasoning of courts across the country that have, for decades, found the same. *See, e.g.*, *Mak*, 683 F.3d at 1134–36; *Defense Distributed*, 121 F. Supp. 3d at 691–96; *Stagg*, 354 F. Supp. 3d at 469–71; *cf. Edler*, 579 F.2d at 521; *Posey*, 864 F.2d at 1496–97. The consistency of these authorities—both before and after *Reed*—is striking and underscores *Reagan*'s observation that *Reed* did not bring about a sea change in First Amendment jurisprudence.[5] *See Reagan*, 596 U.S. at 73–75; *see also Norton Outdoor Advert., Inc. v. Vill. of St. Bernard*, 99 F.4th 840, 848 (6th Cir. 2024) (explaining that *Reagan* "clarified that *Reed*'s importance is somewhat circumscribed"). Thus, these decisions remain persuasive, and the Court adopts their reasoning here.

Several considerations further justify the Court's conclusion. First, the technical-data licensing requirements do not suffer from "a content-based purpose or justification." *Reagan*, 596 U.S. at 69; *see also Reed.*, 576 U.S. at 164. As explained in *Mak*, "the AECA prohibits export without a license of items on the USML without regard to content or viewpoint . . . . [and] [t]he purpose of the AECA does not rest upon disagreement with the message conveyed." 683 F.3d at 1134 (internal citations omitted). Instead, the licensing requirements are explicitly concerned with "furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Indeed, "[t]he ITAR does not regulate disclosure of technical

---

[5] Particularly relevant here, *Reagan* clarified that statutes may require some examination of speech, and may consider speech's function or purpose, without necessarily requiring strict scrutiny. *See Reagan*, 596 U.S. at 73–75.

data based on the message it is communicating[;] . . . . [r]ather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals." *Defense Distributed*, 121 F. Supp. 3d at 694.

Moreover, viewed holistically, the AECA and ITAR's regulatory framework demonstrates that the licensing requirements fundamentally regulate conduct and not speech. As explained by the Sixth Circuit,

> [t]he Supreme Court has never applied exacting free-speech scrutiny to laws that bar conduct based on the harm that the conduct causes apart from the message it conveys . . . . even if the ban on conduct imposes incidental burdens on speech . . . . [and] even if the person engaging in the conduct intends thereby to express an idea.

*Lichtenstein v. Hargett*, 83 F.4th 575, 583 (6th Cir. 2023) (internal quotations and citations omitted). Here, the AECA and ITAR prohibit the unauthorized foreign transmission of military technology "based on the harm that the conduct causes apart from the message it conveys." *See id.* In particular, the AECA and ITAR prohibit the specific and delineated act of "export[ing]" defense articles without a license, 22 C.F.R. § 120.33(a)(1); 22 U.S.C. § 2778(b)(2), to prevent "arms race[s]," "the development of weapons of mass destruction," "international terrorism," the "outbreak or escalation of conflict," and "prejudice [to] the development of . . . arms control." *See* 22 U.S.C. § 2778(a)(2); *see also* 22 C.F.R. § 120.18(a)(1). Whatever "incidental burden[] on speech" these licensing requirements impose, *Lichtenstein*, 83 F.4th at 583, they exist within a wider AECA framework that serves to prohibit the unlicensed export of extremely dangerous military technology such as "[w]arships," "[a]nti-tank missiles and rockets," and "attack helicopters." 22 C.F.R. § 121.1. Furthermore, the scope of the technical-data licensing requirements are relatively small, barring only the unlicensed transmission of "information . . . required" to produce such technology. *See* 22 C.F.R. § 120.33(a)(1); 22 U.S.C.

11

§ 2778(b)(2); *see also* 22 C.F.R. §§ 120.33(b), 120.34.

In sum, the AECA and ITAR's technical-data licensing requirements are subject to intermediate scrutiny. *See Mak,* 683 F.3d at 1135; *Stagg*, 354 F. Supp. 3d at 469–70. The Court therefore asks whether the licensing requirements "advance[] important governmental interests unrelated to the suppression of free speech and do[] not burden substantially more speech than necessary to further those interests." *KenAmerican Res., Inc. v. U.S. Sec'y of Lab.*, 33 F.4th 884, 893 (6th Cir. 2022) (quoting *Holder*, 561 U.S. at 26–27. The licensing requirements satisfy this test. As discussed above, the overriding purpose of the licensing requirements is to prevent for reasons of national security and foreign policy the unauthorized export of military technology. *See* 22 U.S.C. § 2778(a)(1). This is without question a vitally important interest—"preserving national security is 'an urgent objective of the highest order.'" *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (quoting *Holder*, 561 U.S. at 28); *see also Mak*, 683 F.3d at 1135 ("We have long[]recognized the unquestionable legitimacy of the Government's important interest in regulating the international dissemination of military information." (internal quotation omitted)). Moreover, the licensing requirements "do[] not burden substantially more speech than necessary to further" these interests. *See KenAmerican*, 33 F.4th at 893. The technical data subject to the licensing requirements is already narrowly defined to include only information "required" for, and "directly related" to, defense articles. 22 C.F.R §§ 120.33(b), 121.1. In addition, various provisions throughout the AECA's regulatory regime further exclude several categories of information from the licensing requirements. *See, e.g.*, § 120.33(b) (excluding information in the public domain as well as general scientific, mathematical, or engineering principles); *see also id.* §§ 125.4(b)(3), (b)(9), (b)(10).

Having concluded that the licensing requirements are content-neutral and satisfy intermediate scrutiny, the Court turns to Defendants' remaining First Amendment arguments. First, Defendants assert that "[t]he ITAR regime . . . functions as a prior restraint on speech . . . but without the safeguards necessary to pass First Amendment muster." (D.N. 218, PageID.2838) "A prior restraint is any law forbidding certain communications when issued in advance of the time that such communications are to occur." *Schmitt v. LaRose*, 933 F.3d 628, 637 (6th Cir. 2019) (internal quotations omitted). "The fundamental objection to systems of prior restraint is that they create a risk of government censorship of expressive activity." *Id.* at 638 (citation omitted). As a result, successful prior-restraint challenges "typically emerge from licensing schemes that directly target core expressive conduct and authorize a licensor to pass judgment on the content of speech." *See id.* (collecting cases) (quotation and citations omitted). For example, unconstitutional prior restraints have restricted such conduct as the dissemination of newspapers, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988), public speech on college campuses, *McGlone v. Bell*, 681 F.3d 718 (6th Cir. 2012), the dissemination of films, *Freedman v. Maryland*, 380 U.S. 51 (1965), and nude and semi-nude dancing. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377 (6th Cir. 2001). Conversely, the Sixth Circuit has rejected prior-restraint challenges to regulations that primarily regulate non-expressive activity because the "second-order effect[s] on protected speech" created by such statutes do not impose "the same risk of censorship inherent in prior-restraint cases."[6]

---

[6] Other circuits do the same. *See, e.g.*, *Green v. U.S. Dep't of Just.*, 111 F.4th 81, 101–02 (D.C. Cir. 2024) (Digital Millennium Copyright Act's regulatory exemption process not a prior restraint on speech); *Nat'l Fed'n of the Blind of Ark., Inc. v. Pryor*, 258 F.3d 851, 855–56 (8th Cir. 2001) (statute limiting phone solicitation not a prior restraint); *Shero v. City of Grove*, 510 F.3d 1196, 1202–03 (10th Cir. 2007) (three-minute time limitation on public comments at city council meetings not a prior restraint). Indeed, the court in *Green* stressed that "[o]nly licensing

13

*Schmitt*, 933 F.3d at 638 (declining to apply prior-restraint framework to laws governing ballot-initiative process); *see also Beiersdorfer v. LaRose*, No. 20-3557, 2021 WL 3702211, at \*8 (6th Cir. Aug. 20, 2021) (same); *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 434 (6th Cir. 2009) (explaining that a policy limiting the length of speaking opportunities at board of education meetings was not a prior restraint); *Bronco's Ent., Ltd. v. Charter Twp. of Van Buren*, 421 F.3d 440, 452–53 (6th Cir. 2005), *as amended on reh'g* (Sept. 23, 2005) (moratorium on submission of rezoning petitions and special-approval uses not a prior restraint).

In light of the authority cited above, the AECA and ITAR's technical-data licensing requirements do not constitute unconstitutional prior restraints. Notably, the AECA and ITAR's regulatory regime has existed for decades, and no court has applied the prior-restraint framework to strike down its technical-data licensing requirements. *See Edler*, 579 F.2d at 521 (holding that a prior iteration of the AECA and ITAR's technical-data licensing requirements was not a prior restraint); *Posey*, 864 F.2d at 1496–97 (reaffirming *Edler*); *Mak*, 683 F.3d at 1135 (stressing that the Ninth Circuit "has repeatedly rejected First Amendment challenges to the AECA, its implementing regulations, and its predecessor, the MSA"); *Stagg*, 354 F. Supp. 3d at 470–71 (rejecting prior-restraint challenge to aspects of the AECA and ITAR's licensing requirements). *But see Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279, 1290–92 (N.D. Cal. 1996) (concluding, albeit with reservations, that the AECA and ITAR's general technical-data licensing scheme was not a prior restraint because of the Ninth Circuit's decisions in *Edler* and *Posey*).

---

laws with 'a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat' of censorship are 'vulnerable to facial challenges.'" *Green*, 111 F.4th at 101 (quoting *Lakewood*, 486 U.S. at 759). In other words, the *Green* court recognized that "not all government licensing schemes are subject to the 'extraordinary doctrine' permitting facial First Amendment challenges." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794, (1989)).

This is unsurprising given that the technical-data licensing requirements do not "directly restrict core expressive conduct" like disseminating newspapers or speaking on college campuses. *Schmitt*, 933 F.3d at 638. Instead, they target a narrowly delineated, and undeniably dangerous, activity—exporting military technology. In short, the licensing regime is not an unconstitutional prior restraint because it lacks a "close enough nexus to expression . . . to pose a real and substantial threat" of censorship risks.[7] *Lakewood*, 486 U.S. at 759. Instead, it is better understood as a "law[] of general application . . . not aimed at conduct commonly associated with expression" and thereby imposing "little danger of censorship."[8] *Id.* at 760–61.

Indeed, the Court is convinced that the concerns justifying the First Amendment's prior-restraint framework are not implicated by the technical-data licensing scheme at issue here. There are

> two major First Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action. It is when statutes threaten these risks to a significant degree that courts must entertain an immediate facial attack on the law. Therefore, a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.

---

[7] As Defendants rightly concede, the additional procedural safeguards articulated by the Supreme Court in *Freedman* apply to "content-based prior restraints." (D.N. 218, PageID.2842) As the Court has determined that the technical-data licensing requirements are content-neutral, *Freedman*'s protections do not apply. *See Thomas*, 534 U.S. at 322–23 (explaining that *Freedman* does not apply to "content-neutral time, place, and manner" licensing schemes); *see also H.D.V.-Greektown*, 568 F.3d at 621.

[8] The technical-data licensing scheme is concerned with expression insofar as the "export" of technical data is defined to include the "transmission [of information] out of the United States . . . in any manner." 22 C.F.R. § 120.50. But the essential thrust of the AECA and ITAR's regulatory regime is to prevent the foreign dissemination of military technology, and "[t]he authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of the blueprints specifying the construction of the very same equipment." *Edler*, 579 F.2d at 520.

*Lakewood*, 486 U.S. at 759. Because the licensing requirements merely regulate the act of exporting technical data, they do not "give[] a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* And for the same reason, the licensing requirements do not impose the "difficulty of effectively detecting, reviewing, and correcting content-based censorship." *Id.* Instead, "self-censorship," to the extent it exists under the scheme, merely limits the unauthorized foreign dissemination of military technology.[9] *See id.*; 22 U.S.C. § 2778(a)(1). In sum, the prior-restraint framework is not properly applied to the technical-data licensing scheme at issue in this case.

Of course, the Supreme Court has also required content-neutral licensing regimes to "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323. Such standards are present here. The AECA requires that all licensing decisions "take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements." 22 U.S.C. § 2778(a)(2). Moreover, when a license is denied or revoked, the DDTC is required to "notify" the applicant or licensee of "the reasons for the action" with

---

[9] The United States argues that the technical-data licensing scheme bears little resemblance to the statutes invalidated in cases cited by Defendants. (D.N. 242, PageID.3449) The Court agrees that the ITAR's content-neutral approach, focused as it is on the non-expressive act of exporting, is not analogous to the laws at issue in those cases. *See, e.g.*, *Freedman*, 380 U.S. at 52–54 (motion picture censorship); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 124–28 (1992) (protesting); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (publishing newspapers); *Lakewood*, 486 U.S. at 753–55 (placement of newsracks).

specificity.  22 C.F.R. § 120.18(b).  These provisions ensure that licensing officials consider specific delineated criteria when making license determinations and that any such determination is memorialized and specifically justified for use in later litigation.

Finally, Defendants contend that the AECA and ITAR's technical-data licensing requirements facially violate the First Amendment as overbroad.  (D.N. 218, PageID.2853)  To succeed on this argument, Defendants must "demonstrate from the text of the statute and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally."  *United States v. Coss*, 677 F.3d 278, 289 (6th Cir. 2012) (quoting *Am. Booksellers Found. for Free Expression v. Strickland*, 601 F.3d 622, 627 (6th Cir. 2010)).  As explained by the Supreme Court,

> the allowance of a facial overbreadth challenge to a statute is an exception to the traditional rule that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court. . . . .
>
> Even though the challenge be based on the First Amendment, the overbreadth doctrine is not casually employed.  Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, [courts] have recognized that the overbreadth doctrine is strong medicine and have employed it with hesitation, and then only as a last resort . . . . [F]acial overbreadth adjudication is an exception to . . . traditional rules of practice and . . . its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from pure speech toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws.

*L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 38–40 (1999) (internal quotations and citations omitted); *see also United States v. Henson*, 705 F. App'x 348, 351–52 (6th Cir. 2017).  Thus, "'[p]articularly where conduct and not merely speech is involved,' a statute will not be invalidated as [facially] overbroad unless it 'reaches a substantial number of

17

impermissible applications.'"  *Henson*, 705 F. App'x at 352 (quoting *New York v. Ferber*, 458 U.S. 747, 770–71 (1982)).

Defendants cannot satisfy this burden.  Courts have consistently rejected overbreadth challenges to the AECA and ITAR's technical-data licensing requirements.  *See, e.g.*, *Mak*, 683 F.3d at 1136; *Stagg*, 354 F. Supp. 3d at 469–70; *see also Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 13 (D.D.C. 1996).  For example, in *Mak*, the Ninth Circuit observed that the AECA and ITAR "delineate[] narrowly the scope of information subject to arms controls" and "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works."  683 F.3d at 1136 (internal quotations and citations omitted).  Indeed, to be regulated, information must be (1) required for and directly related to (2) a defense article as enumerated in the USML and (3) not subject to the numerous exemptions for protected expression.  *See* 22 C.F.R. §§ 120.33, 121.1; *see also id.* § 125.4.  Thus, the AECA and ITAR's regulatory regime employs several safeguards to prevent the licensing requirements from reaching "a substantial number of impermissible applications."  *See Henson*, 705 F. App'x at 352.  Defendants' overbreadth claim therefore fails.  *See Coss*, 677 F.3d at 289.

For the reasons explained above, the Court will deny Defendants' motion to dismiss pursuant to the First Amendment.  (D.N. 218)

### B.    Fifth Amendment

Defendants also challenge the AECA and ITAR's technical-data licensing requirements as unconstitutionally vague under the Fifth Amendment.  (D.N. 219)  The Fifth Amendment prohibits convictions "if the statute under which [they] are obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or

encourages seriously discriminatory enforcement." *Holder*, 561 U.S. at 18 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). As the Sixth Circuit has explained, "[a] statute is unconstitutionally vague only if it either (1) defines [the] offense in such a way that ordinary people cannot understand what is prohibited, or (2) encourages arbitrary or discriminatory enforcement." *United States v. Kettles*, 970 F.3d 637, 650 (6th Cir. 2020) (internal quotations omitted) (alteration in original). Here, Defendants argue that the ITAR's use of the phrase "directly related" to define the kinds of technical data subject to the licensing requirements fails to provide fair notice and is standardless. (D.N. 219, PageID.2894–902)

"Few statutes meet the void-for-vagueness threshold[] [because] a 'strong presumptive validity' applies to all acts of Congress and mere 'difficulty' in determining a statute's meaning does not render it unconstitutional." *Kettles*, 970 F.3d at 650 (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)). Still, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enforcement." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). So while laws regulating economic conduct are subject to "a less stringent vagueness test," "a greater degree of precision is required of criminal statutes." *Condon v. Wolfe*, 310 F. App'x 807, 820–21 (6th Cir. 2009) (citations omitted). Similarly, the Court applies "a more stringent vagueness test" when the law at issue "interferes with the right of free speech." *Holder*, 561 U.S. at 19 (quotation omitted). But "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* at 19 (quotation omitted); *see also United States v. Theunick*, 651 F.3d 578, 585 (6th Cir. 2011) ("[T]he practical necessities of discharging the business of government inevitably limit[] the

19

specificity with which legislators can spell out prohibitions." (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952))).

Importantly, because individuals "who engage[] in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," the Court must consider Defendants' Fifth Amendment challenge "as applied to the particular facts at issue." *Holder*, 561 U.S. at 18–20 (quotation omitted); *see also United States v. Huff*, 630 F. App'x 471, 487–88 (6th Cir. 2015). This rule "makes no exception for conduct in the form of speech." *Holder*, 561 U.S. at 20 (citation omitted). "Thus, even to the extent a heightened vagueness standard applies, a [defendant] whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice . . . . [a]nd he certainly cannot do so based on the speech of others."[10] *Id.*

The United States argues that Defendants' Fifth Amendment challenge must fail because "Defendants *knew* that the drawings they sent to Chinese nationals were ITAR-controlled and required a license for export." (D.N. 239, PageID.3402) The government contends that the evidence at trial will demonstrate that Defendants possessed actual knowledge that their export of technical data was illegal.[11] (*Id.*, PageID.3402–04) The government also notes that because

---

[10] A defendant may raise a facial overbreadth challenge under the First Amendment when speech rights are implicated by the statute in question. *Holder*, 561 U.S. at 20. But such a challenge is distinct from a Fifth Amendment vagueness challenge, which must initially be considered on an as-applied basis. *See id.* (explaining the distinction between First Amendment overbreadth challenges and Fifth Amendment vagueness challenges); *see also Coss*, 677 F.3d at 289 ("Although ordinarily [a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others, we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." (internal quotations omitted) (alteration in original)).

[11] For example, the government asserts that the evidence at trial will demonstrate that "Monica Pascoe processed purchase orders by General Dynamics that contained explicit warnings

"the benchmark for such a challenge is whether the AECA and ITAR were vague as applied to Defendants, [and] not in hypothetical scenarios," the Court may deny Defendants' Fifth Amendment challenge on the ground that it is premature.  (*Id.*, PageID.3402)

The Court agrees that Defendants' Fifth Amendment challenge is premature.  To properly determine whether the technical-data licensing requirements were unconstitutionally vague as applied to Defendants, the Court must consider the evidence to be presented at trial.   In particular, the Court must examine the evidence regarding Defendants' knowledge that the exported drawings were subject to the AECA and ITAR's licensing requirements.  Courts in this circuit routinely defer ruling on Fifth Amendment vagueness challenges until after trial for similar reasons.  *See, e.g.*, *United States v. Kettles*, No. CR 3:16-00163-1, 2017 WL 2080181, at *3 (M.D. Tenn. May 15, 2017) (explaining that the challenge was premature because "the court cannot determine the nature and extent of [the defendant's] conduct in this case and, therefore, also cannot determine whether [the law] is void for vagueness as applied to that conduct"); *United States v. Coffman*, No. 09-CR-181-KKC, 2010 WL 4510976, at *2 (E.D. Ky. Nov. 1, 2010) ("Accordingly, the Court finds that it cannot determine whether the . . . statutes are void for vagueness as applied to the Defendant until the Government puts on its case-in-chief"); *United States v. Carpenter*, No. 3:21-CR-38-KAC-DCP, 2022 WL 17834330, at *12 (E.D. Tenn. Aug. 25, 2022), report and recommendation adopted, No. 3:21-CR-38-KAC-DCP, 2022 WL 17450713 (E.D. Tenn. Dec. 6, 2022) (collecting cases); *United States v. United Mem'l Hosp.*, No. 1:01CR238, 2002 WL 33001119, at *4 (W.D. Mich. July 23, 2002) (holding that a "pre-trial

---

providing her notice that [Quadrant Magnetics] could not lawfully export General Dynamics'[] technical data without a license." (D.N. 239, PageID.3403)  In addition, the government intends to present evidence that "in August 2017, GE Aviation provided Defendants with actual notice that they were unlawfully exporting ITAR-controlled technical data . . . to China."  (*Id.*, PageID.3404)

challenge to the vagueness of the federal statutes at issue is premature and should be raised, if at all, under Federal Rule of Criminal Procedure 29").[12]  Consistent with this approach, the Court will deny without prejudice Defendants' motion to dismiss on Fifth Amendment grounds.[13]

## III.    CONCLUSION

For the reasons set out above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)    Defendants' motion to dismiss pursuant to the First Amendment (D.N. 218) is **DENIED**.

(2)    Defendants' motion to dismiss pursuant to the Fifth Amendment (D.N. 219) is **DENIED** without prejudice.

February 13, 2025

**David J. Hale, Judge**
**United States District Court**

---

[12] As noted above, in contrast to Fifth Amendment vagueness challenges, First Amendment overbreadth challenges are permitted on a facial basis. *Holder*, 561 U.S. at 20; *Coss*, 677 F.3d at 289.

[13] Defendants also argue that the licensing requirements violate the "ascertainable certainty" doctrine. (D.N. 219, PageID.2902–04)  But Defendants concede that the Sixth Circuit has explicitly "decline[d] to decide whether [that doctrine] should be adopted in this circuit." (*See id.*, PageID.2902 (quoting *ECM BioFilms, Inc. v. Fed. Trade Comm'n*, 851 F.3d 599, 619 n.8 (6th Cir. 2017)))  Moreover, Defendants have cited no binding cases applying this doctrine in the criminal context, and the Court is aware of none.  Absent further guidance as to how or whether the Sixth Circuit would apply this doctrine, the Court declines to extend it here.